# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                      :

FENG LI and KENNETH      :
ELLMAN,                     :

                   :

        Appellants,    :     Civil Action No. 14-0538 (FLW)

                   :

     v.              :       **OPINION**

                   :

DIANA PENG _as Administratrix of_ :
_the Estate of Alfred T.C. Peng_,  :
TZULI HSU, JOSEPH HUANG,  :
STEPHEN HUANG, PEN FA LEE, :
and VERONICA WAN, _as_     :
_Administratrix of the Estate of Chee_ :
_C. Wan_,                :

                   :

        Appellees.     :
_____:

**WOLFSON**, **United States District Judge**:

      Before the Court is the appeal of Feng Li ("Appellant" or "Feng Li") and Kenneth Ellman (collectively "Appellants") from the Order of the Bankruptcy Court granting summary judgment to Diana Peng, et al. ("Appellees"). Following a hearing held on December 16, 2013, the Bankruptcy Court, the Honorable Michael B. Kaplan presiding, found that Appellants' obligations are not dischargeable in bankruptcy, pursuant to 11 U.S.C. § 727(a)(4), because Appellant knowingly and fraudulently made a false oath or account in connection with his bankruptcy petition. Alternatively, the Bankruptcy Court found that Appellant was collaterally estopped from challenging the finding of the New Jersey Supreme Court that he knowingly misappropriated client funds, and therefore denied Appellant discharge pursuant to § 523(a)(4). Appellant appealed.

      For the reasons set forth below, this Court finds that i) the Bankruptcy Court's findings that Appellant made misrepresentations in connection with his bankruptcy petition are not clearly

erroneous, ii) Appellant is collaterally estopped from challenging the findings of the New Jersey Supreme Court, and iii) the Bankruptcy Judge properly dismissed Appellants' counterclaims. Accordingly, the decision of the Bankruptcy Court is affirmed in its entirety.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In September of 2005, Appellees retained Appellant, an attorney, to represent them in a New York state lawsuit against Appellees' former business partner, alleging, *inter alia*, that the former partner engaged in fraud in connection with a commercial property development in which Appellees had been persuaded to invest. [Record on Appeal, hereinafter A1341-42]. Prior to Appellant's involvement, Appellees had been represented by at least two other attorneys during fifteen years of largely inconclusive litigation. [A1342]. Appellant and Appellees entered into a contingent fee agreement, drafted by Appellant, to compensate Appellant for the legal services he was to provide. [A1239-41]. Importantly for the later dispute, the agreement was hastily drafted and contained numerous, serious ambiguities and omissions. After what all parties acknowledge was a significant expenditure of effort by Appellant over four years, including a full trial, Appellees won their lawsuit. Judgment was entered in favor of Appellees on March 24, 2008, in the amount of approximately $3.5 million, including both damages and substantial prejudgment interest. [A1243-45]. The court in which the suit was litigated, the New York Supreme Court, Queens County, directed that the judgment be paid to "Feng Li, Esq. the attorney for the petitioners, to be deposited in the attorney's escrow account from which he shall make the appropriate distributions to the petitioners/judgment creditors." [A1248]. One of Appellees' prior counsel had already secured a partial recovery totaling approximately $515,000, representing the

proceeds from a real estate sale by the former business partner which had been held in trust for Appellees by the former partner's attorney. After Appellees' favorable judgment, on March 25, 2008, the New York Supreme Court ordered that this sum too should be transferred to Appellant for distribution to Appellees. [A1251-54]. Appellant received the $515,000 and deposited it in a Sovereign Bank trust account on May 8, 2008. [A1347].

Appellees' former business partner appealed the judgment and posted with the court $3,544,000, the amount of the judgment and prejudgment interest. In an opinion issued on May 5, 2009, [A687], and an order issued on July 23, 2009, the judgment was affirmed. [A1247-48]. The dispute between the parties to this action began when the time came to distribute the judgment funds. On August 1, 2009, before the New York state court had released any funds to Appellant, Appellees met with Appellant to discuss the terms of the distribution of the judgment funds and of the funds already held in the Sovereign Bank trust account. [A1257]. The parties disputed the scope of their fee agreement. Specifically, Appellees sought to enforce the agreement as written, which appeared to be governed by New Jersey law, made no provision for the taking of a contingent fee on prejudgment interest — a large portion of the recovery from the suit — and provided a sliding scale to determine Appellant's percentage of recovery. [A1239-41]. Appellant, claiming to have made a mistake in the drafting of the agreement, stated his intention to unilaterally reform the agreement under New York law to a 1/3 contingent fee on the whole amount of the recovery, including prejudgment interest. The parties also disagreed about whether, if the sliding scale were to apply, whether it should be applied to each Appellee separately or to all of the Appellees as a single group. The former would result in a considerably larger fee for Appellant. [A1349-1350]. This Court could continue to discuss the precise nature of the fee dispute at length, and, indeed, Appellants devoted all of the briefing concerning their counterclaims below and much

of their briefing on appeal arguing the merits of reforming the fee agreement. However, neither the validity of Appellants' concerns about the fairness of the fee agreement, nor the appropriateness of reforming the agreement are before this Court. As explained below, before the fee dispute could be adjudicated before any court or other authority, Appellant engaged in unethical self-help and simply acted as if his version of the fee agreement were in force.

While the parties were still disputing the appropriate distribution, collection of the judgment went forward, and, on August 14, 2009, the Commissioner of Finance for the State of New York sent Appellant a check for $3,548,506.91, representing the amount of the judgment affirmed on appeal plus interest. [A1348]. Appellant deposited the check in an attorney trust account at JP Morgan Chase Bank. [A1348]. Unbeknownst to Appellees, shortly thereafter, on August 18, 2009, Appellant transferred $242,575 from the Sovereign Bank trust account into a trust in favor of his son, Vincent Li, and $282,459 from the Sovereign trust account into a trust in favor of his daughter, Christine Li. On or around the same date, Appellant transferred from the JP Morgan trust account $382,903 into the trust for his son and $352,005 into the trust for his daughter. [A1354]. All told, Appellant transferred $1,259,942 of the litigation proceeds from the trust accounts held for his clients to personal trusts established for the benefit of his children.

As August 2009 continued, certain of Appellees began retaining counsel and sending letters to Appellant instructing him not to dissipate any of the judgment funds until the fee dispute had been resolved. Appellant responded on September 8, 2009, by sending a letter to all Appellees, making a thinly veiled threat to report to the New York State court that certain of Appellees had misrepresented their damages at trial, and openly threatening to charge Appellees an additional $273,375 fee for the handling of the appeal and collection actions if Appellees persisted in litigating the fee dispute. [A1357-58]. With no resolution in sight, on September 11, 2009,

4

Appellees filed a lawsuit against Appellant in the Superior Court of New Jersey, Law Division, Middlesex County, concerning the funds held in the trust accounts. On September 23, the New Jersey Court issued an order to show cause, returnable on September 25, temporarily restraining Appellant from dissipating the funds received on his client's behalf. [A1359-60]. Appellant immediately requested that the order to show cause hearing be adjourned to give him time to prepare, and the hearing was moved to October 2, 2009. Once again unbeknownst to the Appellees, and without informing the New Jersey Court, Appellant used the extension of time before the Order to Show Cause hearing to transfer all of the moneys he had taken from the attorney trust accounts from his children's accounts to parties in China. [A1360]. Specifically, after having received the temporary restraining order, in four transactions on September 23, 2009, Appellant's wife, at Appellant's direction, wired all $1,293,783.73 — the new total with accrued interest — to Chinese nationals Liu Xi Yu and Lui Qi Yu, and to accounts with the Bank of China and Honkong & Shanghai Banking. [A1360]. At the hearing on October 2, 2009, it became clear that Appellant had transferred the judgment funds out of the attorney trust funds. The New Jersey Court ordered Appellant to return, within ten days of the court's order, any monies he had transferred out of the attorney trust accounts. [A1510:8-15]. The New Jersey Court formally memorialized its oral order from the hearing in a written order on October 15, 2009.

Appellant did not comply with the New Jersey Court's order, and instead responded by filing a lawsuit against Appellees in the Supreme Court of New York, Westchester County, seeking to enjoin the New Jersey Superior Court action. [A1435]. On December 30, 2009, the New York Supreme Court, Westchester County, ruled that it would not enjoin the New Jersey proceeding. Appellant appealed. [A1364]. The Supreme Court of New York, Appellate Division for the Second Judicial Department, affirmed the lower court's order on January 25, 2010. [A1435]. Having failed

in his attempt to enjoin the New Jersey action by prosecuting his case in another forum, Appellant nevertheless again failed to comply with the New Jersey Court's order to return the dissipated funds. Instead, Appellant filed for bankruptcy on January 26, 2010, the day after losing his New York appeal. [A1364].

Appellant was deposed in connection with his bankruptcy petition on June 2, 2010. Appellees' counsel questioned Appellant about what he had done with the money held in the attorney trust funds. Appellant responded that he had disbursed $2.8 million out of the approximately $4 million judgment to his clients. After considerable questioning, during which Appellant often provided vague and evasive answers, Appellant testified that he took the other $1.2 million in legal fees and used it to pay debts owed to the National Business Loan Creditor and Imperial Creditors and to pay down his law school student loans. Appellant did not disclose that he had in fact transferred the money to accounts and individuals in China. [A1368].

While the Bankruptcy proceedings were still progressing, Appellees lodged formal complaints against Appellant with the New York ethics authorities sometime in early 2010, and with the New Jersey Office of Attorney Ethics ("OAE") on January 24, 2011. Appellees complained that Appellant had knowingly misappropriated client funds in violation of a Court Order. Reviewing the evidence and considerable discovery, the New Jersey OAE filed a detailed report, finding by clear and convincing evidence that Appellant had misappropriated client funds. The OAE recommended disbarment. [A1399-487]. On May 21, 2013, the Supreme Court of New Jersey considered the OAE's report, independently reviewed Appellant's conduct, concluded that Appellant knowingly misappropriated client funds, and ordered Appellant's disbarment. [A1335-37]. Discovery and briefing in the New York ethics actions proceeded parallel to the New Jersey action until Appellant moved in the New Jersey Federal District Court to withdraw the reference

of his case from the Bankruptcy Court to the District Court. [A426-27]. Appellant successfully sought a stay of the New York ethics proceeding pending the resolution of his motion to withdraw reference. [Joint Brief of Appellants, Exhibit A]. At this point, this Court feels compelled to note a flagrant misrepresentation made by Appellant in his briefing on appeal. Appellant represents to this Court that the Supreme Court of New York, Appellate Division for the Second Judicial Department "the only Sovereign with Subject Matter and Geographical Jurisdiction," "has refused to suspend or discipline [Appellant]." [Joint Brief of Appellants, 12 (emphasis in original)]. Upon review of the Court's order, and after consultation with New York Appellate Division's clerk's office, it is clear that the proceeding before that court is only stayed pending the resolution of the motion to withdraw reference by another judge in this District. [Joint Brief of Appellants, Exhibit A]. The New York court was not even aware of the present appeal before this Court, and certainly did not render any findings in favor of Appellant concerning his handling of the fee dispute and attorney trust funds. In short, Appellant has misrepresented to this Court that a court judgment conflicting with the findings of the New Jersey Supreme Court was issued by the courts of the State of New York.

The hearing in Appellant's case was held before the Bankruptcy Court on December 16, 2013, the Honorable Michael B. Kaplan presiding. The Bankruptcy Court denied discharge to Appellant under two alternate and independent bases. First, "based on the filings that are of record in the debtor's case" and "not rely[ing] upon the findings of the New Jersey Supreme Court," the Bankruptcy Court ruled that Appellant "knowingly and fraudulently, in connection with [his bankruptcy] case made a false oath or account," and accordingly his obligations were nondischargeable under § 727(a)(4). [A1628]. Second, applying the doctrine of collateral estoppel to rely upon the findings of the New Jersey Supreme Court, the Bankruptcy Court ruled that "the

debtor engaged in a knowing . . . misappropriation of client funds, and that the debtor did not have a good faith belief as to the entitlement of those funds," and accordingly his obligations were nondischargeable under § 523(a)(4). [A1630]. Appellant now appeals both determinations.

## II. STANDARD OF REVIEW

The standard of review for Bankruptcy Court decisions is determined by the nature of the issues on appeal. *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee,* 321 B.R. 147, 157 (D.N.J. 2005). Findings of fact are reviewed under a "clearly erroneous standard." Fed. R. Bankr. P. 8013. A factual finding is overturned as being "clearly erroneous" only when a reviewing court has a "definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 622 (1993). On the other hand, legal conclusions from the Bankruptcy Court are subject to de novo, or plenary, review by the district court. *Donaldson v. Bernstein,* 104 F.3d 547, 551 (3d Cir. 1997). If the issues on appeal present both findings of fact and conclusions of law, the applicable standard, "clearly erroneous" or "de novo," must be appropriately applied to each component. *Meridian Bank v. Alten,* 958 F.2d 1226, 1229 (3d Cir. 1992) (citing *In re Sharon Steel Corp.,* 871 F.2d 1217, 1222 (3d Cir. 1989) and *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102–103 (3d Cir. 1981)). Lastly, decisions on procedural bases are reviewed for abuse of discretion. *In re United Healthcare Sys., Inc.,* 396 F.3d 247, 249 (3d Cir. 2005). Deference is the hallmark of abuse of discretion review. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143 (1997); *Koon v. United States,* 518 U.S. 81, 98–99 (1996). Thus an exercise of discretion is not disturbed unless the court committed a clear error of judgment in making its decision, meaning that it relied upon "a clearly erroneous finding of

fact, an errant conclusion of law or an improper application of law to fact." *In re Nutraquest, Inc.,* 434 F.3d 639, 645 (3d Cir. 2006); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.,* 246 F.3d 315, 320 (3d Cir. 2001); *Int'l Union, UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 95 (3d Cir. 1987). *See generally In re United Healthcare Sys., Inc.,* 396 F.3d 247, 249 (3d. Cir. 2005) (quoting *In re Trans World Airlines, Inc.*, 145 F.3d 124, 130–31 (3d Cir. 1998)) (a district court reviews "the bankruptcy court's legal determinations de novo, its factual findings for clear error and its exercise of discretion for abuse thereof.").

In the present appeal, Appellant challenges the Bankruptcy Court's findings 1) that Appellant made false oaths in the submission and handling of his bankruptcy petition, 2) that Appellant was collaterally estopped from challenging the findings of the New Jersey Supreme Court that Appellant misappropriated client funds, and 3) that Appellant was judicially estopped from bringing counterclaims not disclosed in his original or amended bankruptcy petition. The first challenge, to the finding of nondischargeability pursuant to § 727(a)(4), concerns questions of fact, and is subject to review for clear error. The second challenge, to the application of collateral estoppel to find nondischargeability pursuant to § 523(a)(4) concerns a question of law and is subject to de novo review by this Court. The third challenge, to the application of judicial estoppel to disallow counterclaims, concerns an exercise of the discretion of the bankruptcy court, and is reviewable for abuse of that discretion.

III. FACTUAL CHALLENGES: § 727(a)(4)

The Bankruptcy Court denied Appellant discharge on the basis of 11 U.S.C. § 727(a)(4)(A), which provides in relevant part that, "no discharge shall be granted if . . . the debtor

knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." Extreme carelessness when filling out a bankruptcy petition and "omission of assets from the debtor's reckless disregard for truth" will not suffice as a defense to knowingly and fraudulently making a false oath. *Scimeca v. Umanoff* 169 B.R. 536, 543 (D.N.J. 1993) *affd sub nom. In re Scimeca,* 30 F.3d 1488 (3d Cir.1994). *See also, In re Elian*, 10-49482 (DHS), 2014 WL 2976295 (Bankr. D.N.J. July 1, 2014). Judge Kaplan made numerous findings of fact on the record concerning specific incidences in which Appellant made false oaths or made omissions with reckless disregard for the truth. Although listed under nine separate headings in briefing, Appellant raises only eight challenges to the factual findings of the Bankruptcy Court.

A. Nondisclosure of the Attorney Trust Account

Appellant's first major contention on appeal is that the Bankruptcy Court was mistaken in finding that Appellant failed to disclose on Schedule B of his bankruptcy petition his attorney trust accounts and the transactions involving those accounts in the six months prior to the filing of his petition. In support of his contention, Appellant directs the Court to an amendment to add creditors made to Schedules F and I in 2013. [A1128, 1130]. The Bankruptcy Court in fact observed that this amendment existed, but opined that the amendments made to schedules other than Schedule B appeared only to have added additional creditors. [A1622:18-24]. The Bankruptcy Court remained "unaware" of any amendment to *Schedule B* disclosing either of the attorney trust accounts.

This Court agrees with the finding of the Bankruptcy Court that Appellant was required to disclose the attorney trust accounts on Schedule B, because it was clear from the undisputed facts that Appellant had used the account for personal purposes, specifically to repay personal creditors

during the sixth month period before his bankruptcy filing. [A0954]. Reviewing Appellant's Schedule B, this Court finds no evidence of an Amendment to reflect the existence of Appellant's attorney trust accounts. Accordingly, this Court finds Appellant's alleged supporting evidence irrelevant to the question of disclosure, and finds the conclusion of the Bankruptcy Court that no disclosure was made not clearly erroneous.

Alternatively, Appellant claims on appeal that the trust account and related transactions were disclosed to his creditors, if not on Schedule B itself, at least at his March 2, 2010 hearing. Reading the transcript of the March 2010 hearing, the Court observes that far from a forthright disclosure of the existence of the trust accounts and his personal transactions involving those accounts, Appellant's testimony was vague, evasive, and defensive. [A1652:5-1654:22]. Nothing in Appellant's testimony undermines the finding of the Bankruptcy Court that Appellant failed to disclose his attorney trust account on his Schedule B. In fact, Appellant's testimony from the March 2010 hearing makes it clear that Appellant intentionally omitted the trust account and its related transactions from Schedule B, even though he was aware that the account had been used to pay personal debts in the six months prior to his filing. [1653:8-11]. Appellant first tacitly acknowledged that he would have been required to disclose the accounts by admitting that he transferred money out of the accounts to pay personal debts. *Ibid.* Next, however, Appellant implausibly maintained that these transfers occurred more than six months before the filing of his petition. [A1653:21-22]. Specifically, Appellant argued with the hearing officer and opposing counsel that a date in August occurred more than six months before a date in January. *Ibid.* When the impossibility of this chronology was made clear to Appellant by the hearing officer, he claimed that the transfers actually probably took place in July. [A1654:5-8 ("HEARING OFFICER: January, December, November, October, September, August, it's within six months." MR. LI: I

11

don't know exactly, Probably July –I think it's more than six months.")]. Opposing counsel, in a series of follow-up questions made it clear that no transfer could have taken place in July, because, by Appellant's own account, he had only received a disbursement of the judgment funds in August. When the impossibility of his proposed July date was made clear, Appellant became nonresponsive. [A1654:21-23 ("COUNSEL 2: Okay and so [how] did you receive the money in July if the check is dated August? MR. LI: Like I said could be August, early August.")]. Accordingly, the Bankruptcy Court's finding that Appellant intentionally failed to disclose his attorney trust accounts on his Schedule B is not clearly erroneous.

B. Nondisclosure of the Weidlinger Retirement Account

Second, Appellant challenges the finding of the Bankruptcy Court that Appellant failed to disclose the existence of his Weidlinger Retirement Account as part of his bankruptcy filing. Appellant admits that he did not disclose the existence of the account in any written form, but contends that his testimony at a 2004 deposition served as a sufficient alternative disclosure. Counter to Appellant's assertions, the 2004 transcript reveals that i) Appellant first claimed to have no retirement accounts, ii) later revised his answer that the Weidlinger account might exist and might contain several thousand dollars, iii) revised it once again to suggest that there was nothing left in the account, and iv) finally concluded that "I don't believe there's any money left over there. Could be." [A1699-700]. Appellant's equivocating during the deposition does not constitute disclosure of the retirement account for the purposes of his bankruptcy proceeding, particularly considering that the cited 2004 deposition was taken fully five years *before* Appellant filed his petition. Finally, Appellant admitted that he did not look into the retirement account prior to the filing of his bankruptcy petition, indicating his lack of diligence in compiling an exhaustive list of

12

his assets. [A1701:6-7]. In short, the account was not disclosed and no amendment was made to remedy the deficiency. The finding of the Bankruptcy Court concerning the Weidlinger Account is not clearly erroneous.

## C. Nondisclosure of Interest in Engineering Firm

Third, Appellant challenges the finding of the Bankruptcy Court that Appellant failed to disclose the existence of his ownership interest in the FL Engineers firm. In support of this assertion, Appellant relies upon an exhibit attached to his appellate brief, which was not part of the record on appeal. The exhibit is a report from the New Jersey Business Gateway Business Entity Information and Records Service and indicates that FL Engineers charter had been revoked in March of 2005 for failure to file annual reports. [Joint Brief of Appellants, Exhibit C]. The document does not reveal the final disposition of the entity's assets. Judge Kaplan's decision indicates that he was not provided with this record below, and Appellant has provided no compelling reason why it was not provided. It appears that, in light of the new evidence, there is at least some uncertainty as to whether Appellant had a surviving interest in FL Engineers. Whether or not the Bankruptcy Judge's finding was in error, however, does not alter the outcome of this appeal because of Appellant's numerous other nondisclosures, which are supported in the record.

## D. Nondisclosure of Counterclaims

Fourth, Appellant challenges the finding of the Bankruptcy Court that Appellant did not properly disclose his counterclaims. Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing "adequate information" to "enable a creditor to make 'an informed judgment' about the

13

Plan." 11 U.S.C. § 1125(a)(1). "Debtors must therefore identify and disclose all 'property of the estate' including all of the debtor's 'legal and equitable' property interests." *Krystal Cadillac-Oldsmobile GMS Truck, Inc. v. GMC,* 337 F.3d 314, 322 (3d Cir. 2003). "This includes such contingent assets as any cause of action [Debtor] may have against [Creditor]." *Kane v. Kane*, No. 08-CV-5633 FLW, 2009 WL 3208653 *5 (D.N.J. Sept. 30, 2009) *aff'd sub nom. In re Kane*, 628 F.3d 631 (3d Cir. 2010); *See also In re Kane*, 628 F.3d 631, 636-37 (3d Cir. 2010) ("As indicated above, a debtor's disclosure obligation extends to 'contingent assets' such as causes of action pursued against another party, because such disclosure 'allows the trustee and the creditors to determine whether to pursue these assets on the creditors' behalf. While a bankruptcy case is pending, it [i]s the trustee, and not [the debtor], who ha[s] the capacity to pursue [the debtor's] claims. Indeed, it would be inconsistent with the Bankruptcy Code to apply a rule requiring the debtor . . . [to] have to supervise and double check the actions of the trustee, . . . [who is] accountable for all property received.") (citations omitted) (alterations in original). Appellant directs the Court's attention to Schedule F of his petition, in which he lists those of his creditors, including Appellees, holding claims *against Appellant*. [A1453]. Nothing in this document unambiguously purports to disclose claims by Appellant *against Appellees*. Appellant also asks the Court to consider his testimony during his 341 hearing to constitute adequate disclosure. Reviewing the transcript, it is clear that Appellant did say his clients owed him money. [A1643:10-12]. However, he later explains that no claim for a specific dollar value appears in the petition, [A1643:19], and that the only mention of the counterclaims anywhere in the petition is the notation in Schedule F, next to the claims of each of his creditors against him, that such claims are "Subject to Setoff." [A1643:19]. Appellant was required to list his claims against Appellees among his contingent assets. Appellant's proposed alternate disclosure of annotating "Subject to Setoff" on

14

the Schedule F list of creditors is not an adequate substitute. The Bankruptcy Court's finding of nondisclosure is not clearly erroneous.

E. Nondisclosure of Home Ownership

Fifth, Appellant challenges the finding of the Bankruptcy Court that there was no evidence in the record that there had been a transfer of Appellant's house to Appellant's former wife. Appellant cites, as evidence of the 2002 transfer of his house, statements *drafted by Appellant* in his 2010 divorce property settlement with his now ex-wife, [A1141], and a deed purporting to have been signed on July 12, 2002, which was not recorded until October 5, 2009. [A1913]. The Bankruptcy judge never questioned that Appellant had produced a deed which purported to have been signed in 2002, but rather, only found that this deed, recorded in 2009, was inconsistent with Appellant's May 23, 2008 representation that Appellant was lawfully seized of the property in order to execute a mortgage upon it. [A1627].

Reviewing the evidence in the record independently, this Court concurs with the Bankruptcy Court. The only documents which attest to a purported transfer of Appellant's house to his wife in 2002 were all created by Appellant after the start of the fee dispute in August of 2009. This fact, coupled with the fact that Defendant represented that he still retained ownership of the house in 2008, directly before the commencement of the fee dispute, gives rise to a strong inference that the purported transfer may have been a sham transaction. From the evidence in the record this Court cannot conclude that the Bankruptcy Court's ruling was clearly erroneous.

F. Nondisclosure of Income on Statement of Financial Affairs

Sixth, the Appellant challenges the finding of the Bankruptcy Court that Appellant failed to disclose on his Schedule B Statement of Financial Affairs the income from the alleged $1.2 million "legal fee" he took without client consent in August of 2009. This Court finds and oddly, Appellant does not truly contest, that there is no reference to his "legal fee" income in Schedule B. Instead, Appellant advances the novel theory that his Amendment to Schedule I, entitled Current Income of Individual Debtor, and his statements at the March 2, 2009 hearing concerning the income should have been considered an adequate substitute disclosure. Appellant's Amended Schedule I states at the very bottom of the page "In the year 2009, I had one time income from New York Litigation of $1,260,472.36." [A1130]. This statement has been erroneously written under the prompt "Describe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document." This Court finds that Appellants one-sentence, vague statement written onto the wrong form and under the wrong prompt did not constitute an honest disclosure of his past income designed to place Appellees on notice. Turning to Appellant's March 2, 2009, testimony, Appellant only provided information about the transfers from the attorney trust funds and his alleged "income" therefrom after his failure to disclose this income in his petition had been revealed by discovery. Subsequent oral disclosure, or even amendment does not erase the negative inference raised by Appellant's initial, intentional omission. *In re Elian*, 10-49482 (DHS), 2014 WL 2976295 (Bankr. D.N.J. July 1, 2014) ("Furthermore, a Debtor cannot undo a false oath upon its discovery by subsequently amending his schedules.") (citing *In re Costello,* 299 B.R. 882, 899–900 (Bankr. N.D. Ill.2003); *Matter of Hussan,* 56 B.R. 288, 293 (Bankr. E.D. Mich.1985); *Matter of Braten Apparel Corp.,* 21 B.R. 239, 262 (Bankr.S.D.N.Y. 1982)).

G. Nondisclosure of "Insider" Payment

Seventh, Appellant challenges the finding of the Bankruptcy Court that Appellant failed to disclose an "insider" payment, namely the transfer of the money taken from the attorney trust accounts to China in order to settle debts related to his alleged internet services company. Under the Bankruptcy Code

> [t]he term "insider" includes--
> (A) if the debtor is an individual--
>      (i) relative of the debtor or of a general partner of the debtor;
>      (ii) partnership in which the debtor is a general partner;
>      (iii) general partner of the debtor; or
>      (iv) corporation of which the debtor is a director, officer, or person in control;

11 U.S.C. § 101(31)(A). In support of his contention that the Bankruptcy Court erred, Appellant directs the Court's attention to the Affidavit of Liu Xi Yu and Lui Qi Yu. [A0954]. Appellant contends that because both men certified that they acted purely as lenders to Appellant's partnership and were repaid by Appellant directly as the personal guarantor of the partnership's loan, Mr. Liu Xi Yu and Mr. Lui Qi Yu were not "insiders" under the Bankruptcy Code. The Bankruptcy Court, to the contrary, found that because Appellant transferred the funds to settle the debt of Appellant's general partnership, an insider transfer had occurred. Neither the Bankruptcy Court nor Appellant elaborated further on their reasoning or provided legal support apart from the definitional statute for their respective conclusions. Both rely upon the same Affidavit. The legal status of the transfer under the Bankruptcy laws is unclear, but this Court again finds that whether or not the Bankruptcy Judge's finding was in error on this point does not alter the outcome of this appeal, because of Appellant's numerous other nondisclosures, which are supported in the record.

H. Nondisclosure of Transfer to Kenneth Ellman

Eighth, the Appellant challenges the finding of the Bankruptcy Court that the Appellant did not properly disclose the sale of his debts to his law partner Kenneth Ellman in the sixth months immediately preceding the filing of his petition. Appellant argues that this "sale" was in the ordinary course of his legal business, namely the compensation of Mr. Ellman for his legal services and assistance to Appellant in handling Appellees' case.

The ordinary course of business exception is designed to balance the interests of Appellant and creditor. *In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 219 (3d Cir. 1994). Its purpose is "to protect recurring, customary credit transactions that are incurred and paid in the ordinary [course] of business of the debtor and the debtor's transferee." 5 *Collier on Bankruptcy* ¶ 547.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012). More specifically, "[t]he preference provisions are designed [to leave undisturbed] normal debtor-creditor relationships, but to derail unusual ones which threaten to heighten the likelihood of Appellant filing for bankruptcy at all and [which undermine] the paramount bankruptcy policy of the equitable treatment of creditors." *Molded Acoustical Products,* 18 F.3d at 224. Whether a transfer was made in the ordinary course of business is a subjective inquiry "calling for the Court to consider whether the transfer was ordinary between Appellant and the creditor." *In re First Jersey Securities, Inc.,* 180 F.3d 504, 512 (3d Cir. 1999). "[T]he most important thing is not that the dealings between Appellant and the allegedly favored creditor conform to some industry norm[,] but that they conform to the norm established by Appellant and the creditor in the period before, preferably well before, the preference period." *Molded Acoustical Products,* 18 F.3d at 223 (quoting *Matter of Tolona Pizza Products Corp.,* 3 F.3d 1029, 1032 (7th Cir. 1993)).

To demonstrate that the ordinary course of business exception applies, the creditor must prove by a preponderance of the evidence that the a debt was incurred by the debtor in the ordinary course of business and that the payment of that debt satisfies one of the two subsections of § 547(c)(2): the payment must have been either: (a) made in the ordinary course of business between Appellant and the transferee, or (b) made according to ordinary business terms. *In re Allied Carriers' Exchange, Inc.,* 375 B.R. 610, 615–616 n. 3 (10th Cir. BAP 2007); *Archway Cookies,* 435 B.R. at 241; 5 *Collier* ¶ 547.04[2].

The first prong of the § 547(c)(2) analysis (under either subsection) addresses the circumstances in which the debt originated and requires the court to examine the degree of "normality of such [occurrence] in each party's business operations generally." 5 *Collier* ¶ 547.04[2][a][I] (citation omitted). In evaluating the issue, the court looks to whether the debt is typical of Appellant's and creditor's business dealings and whether the debt was incurred as a part of an arms-length transaction. *See, e.g., In re Frey Mechanical Group, Inc.,* 446 B.R. 208, 215 (Bankr. E.D. Pa. 2011) (citing authorities).

As elaborated further in *Collier:*

> If the transaction from which the debt arose was not ordinary for Appellant or the transferee, then the defense will fail. Most courts assume this requirement is met by inferring from the evidence that there was nothing "unusual" about the transactions underlying the preferential payment.

5 *Collier* ¶ 547.04[2][a][I].

Here, Appellant made a one-time payment to his law partner, Mr. Ellman, for services rendered on the disputed litigation on September 9, 2009, well after the fee dispute had begun and Appellant became financially distressed. [A1626]. From the record available, the "sale" of the debt to Mr. Ellman appears to be exactly the kind of one-off, unusual transaction that the Bankruptcy laws intend to prevent from receiving special treatment. In September of 2009, Appellant was

already aware that his former clients disputed the amount of his fee, and was on reasonable notice that litigation concerning the amount of the fee was imminent. Nevertheless, just one day after sending his threatening ultimatum to his clients to drop the fee litigation or risk exposure for perjury and additional legal fees, and fewer than five months before declaring bankruptcy, Appellant sought to sell an asset belonging to his firm to an obvious insider. Appellant attempted to subvert the equal treatment of his creditors enshrined in the Bankruptcy Code by paying Mr. Ellman first.

Next, for the purpose of analyzing a defense under § 547(c)(2)(A), the Court must determine if the transfer at issue was "ordinary" as between Appellant and the creditor. The defendant must establish a "baseline of dealing" so that a court can compare the transfers made during the preference period and those made during the parties' prior course of dealings. *Collier* at ¶ 547.04[2][a][ii] (citation omitted). This baseline of dealing must be fixed at least in part during a time in which debtor's day-to-day operations were ordinary in the layman's sense of the word. Preferably, the material period should extend back into the time before the debtor became financially distressed. *Id.* (citing *In re Hancock–Nelson Mercantile Co. Inc.,* 122 B.R. 1006 (Bankr. D. Minn. 1991)); *accord In re Quad Systems Corp.,* 2003 WL 25947345, at *6 (Bankr. E.D. Pa. July 15, 2003). Essentially, the court must evaluate whether the transactions both before and during the preference period were consistent. *See, e.g., In re Allegheny Health, Education and Research Foundation,* 292 B.R. 68, 79 (Bankr. W.D. Pa. 2003).

Here, the "sale" to Mr. Ellman occurred during the period in which Appellant was already financially distressed. Moreover, neither Mr. Ellman nor Appellant has provided a baseline of dealing to which this Court might compare this seemingly one-off transaction. The evidence in the record also suggests that such a showing would be unlikely, as the one-off transaction was designed

to compensate Mr. Ellman for all of the work done on Appellees' case. Appellants having not met their burden, this Court finds that the judgment of the Bankruptcy Court on this point was not clearly erroneous.

IV. LEGAL CHALLENGES: § 523(a)(4)

The Bankruptcy Court found that Appellant was collaterally estopped from challenging the finding of the New Jersey Supreme Court that he knowingly misappropriated client funds, and therefore denied Appellant discharge pursuant to § 523(a)(4). Section 523(a)(4) of the Bankruptcy Code provides that an individual debtor cannot obtain a discharge for any debt obtained via "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The Bankruptcy Court did not make independent factual findings about Appellant's knowing misappropriation of client funds. Instead, it adopted the findings of the New Jersey Supreme Court and found that Appellant was collaterally estopped from relitigating the issue of whether his conduct constituted fraud and/or embezzlement. The only issue before this Court on appeal then, is whether the Bankruptcy Court correctly applied collateral estoppel in adopting the New Jersey's Supreme Court's findings and disregarding Appellant's renewed arguments to the contrary, previously raised before the New Jersey Supreme Court (the "State Court"). In particular, the Bankruptcy Judge gave preclusive effect to the State Court's determination "that Appellant engaged in a knowing . . . misappropriation of client funds, and that Appellant did not have a reasonable good faith belief as to the entitlement of those disputed funds."   [A1630].   The Bankruptcy Judge found that Appellant was collaterally estopped from challenging those findings in the adversary proceeding because "Appellant had both the incentive and the ability to contest

21

those findings" in the disbarment proceeding, and those findings "were critical to a determination before the New Jersey Supreme Court."  [A1630].

The doctrine of collateral estoppel, or issue preclusion, prevents a party from relitigating issues that were adjudicated in a prior lawsuit.  *In re Docteroff,* 133 F.3d 210, 214 (3d Cir. 1997). The purpose of this doctrine is to promote judicial consistency, encourage reliance on court decisions, and protect defendants from being forced to repeatedly relitigate the same issues in multiple lawsuits.  *Allen v. McCurry,* 449 U.S. 90 (1980).  It has been established that collateral estoppel applies in nondischargeability actions in bankruptcy court, even with respect to previous state court judgments.  *In re Docteroff,* 13 F.3d at 214.

In order to determine the preclusive effect of a prior state court proceeding, a federal court looks to the law of the adjudicating state.  *Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 357 (3d Cir. 1999). The disbarment proceeding in this case took place in New Jersey. For collateral estoppel to apply, New Jersey courts require the party asserting the doctrine to show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.  *Wildoner v. Borough of Ramsey,* 316 N.J. Super. 487, 506 (App. Div. 1998) (citing *In re Dawson,* 136 N.J. 1, 20 (1994)).  Additionally, when applying the New Jersey state standard in bankruptcy proceedings, the bankruptcy judges in this District must determine whether those factors were met "after a careful review of the record of the prior case, a hearing at which the parties have the opportunity to offer evidence, and the making of findings of fact and conclusions of law."  *In re Himowitz,* 162 B.R. 109, 112 (Bankr. D.N.J. 1989); *Haize v. Hanover Ins. Co.,* 536

F.2d 576, 579 (3d Cir. 1976).  Applying these factors to the present Appeal, this Court finds that the Bankruptcy Judge was correct in applying collateral estoppel to preclude the issues decided in the State Court disbarment proceeding.[1]

A. The Issues Decided in the Disbarment Proceeding are Identical to the Issues in Appellant's Bankruptcy Proceeding

Appellant argues that the New Jersey Supreme Court, in the disbarment proceeding, did not address the same issues presented by Appellant's action in Bankruptcy Court.  Specifically, Appellant maintains that the case in the State Court was simply a disciplinary proceeding that did not address the issues  – fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny – essential to the nondischargeabilty case in the Bankruptcy Court. 11 U.S.C. § 523(a)(4).

In deciding the identity of issues, this Court "should consider whether there is substantial overlap of evidence or argument in the second proceeding; whether the evidence involves application of the same rule of law; whether discovery in the first proceeding could have encompassed discovery in the second; and whether the claims asserted in the two actions are closely related."  *First Union Nat'l Bank v. Penn Salem Marina, Inc*., 290 N.J. 342, 353 (2007); *see Restatement (Second) of Judgments* § 27 comment c (1982); *Montana v. United States,* 440 U.S. 147, 155 (1979) (the identity of issues requirement is fulfilled where the issues in the current case are "in substance the same" as those previously resolved).  The Third Circuit has

---

[1] Although whether findings made in an attorney disciplinary proceeding would result in collateral estoppel in a subsequent bankruptcy proceeding presents an issue of first impression in New Jersey, one court has found that collateral estoppel applies under these circumstances. *See A to Z Assoc. v. Cooper*, 613 N.Y.S.2d 512, 517 (1993) ("This court therefore concludes that as a matter of law administrative disciplinary findings against an attorney can be used, to the extent the findings are applicable, as dispositive of those issues in a civil action.").

held that "[t]o defeat a finding of identity of the issues for preclusion purposes, the differences in the applicable legal standard must be 'substantial.'" *Raytech Corp. v. White,* 54 F.3d 187, 191 (3d Cir. 1995). While Appellant is correct that the State Court did not rule on any issues relating to the dischargeabilty in bankruptcy of Appellant's liabilities, this was of no consequence for the Bankruptcy Court's decision; the underlying factual issues surrounding Appellant's fraud and misappropriation of client funds, which were directly raised in the New Jersey Supreme Court, were identical to those before the Bankruptcy Court when it made its independent decision concerning dischargeability under § 523(a)(4).

The New Jersey Supreme Court disbarred Appellant because he "lacked a reasonable good faith belief of entitlement to the disputed funds, and . . . his use of the contested funds therefore constituted a knowing misappropriation of client funds for [which] disbarment is required." [A1630]. In particular, the court found that "the written fee agreement with [Appellant's] clients did not authorize the $1.2 million fee [Appellant] took," that Appellant threatened his clients to abandon their claims against him, and that Appellant deliberately deposited the unauthorized funds overseas for personal use after he had been sued. [A1335-36]. In sum, the State Court ultimately had to interpret the disputed fee agreement and make a finding that Appellant had committed wrongdoing in order to disbar Appellant for misappropriating client funds while serving as Appellees' attorney.

Section 523(a)(4) of the Bankruptcy Code provides that an individual debtor cannot obtain a discharge for any debt obtained via "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). To prevail on a claim of nondischargeability under § 523(a), each element must be proven by a "preponderance of the evidence" by the party asserting non-dischargeability. *Grogan v. Garner,* 498 U.S. 279, 285 (1991). The first element of

24

a § 523(a)(4) claim is to prove that Appellant acted in a fiduciary capacity. Bankruptcy laws pertaining to the exception to discharge for debtors acting in a fiduciary capacity are constructed to promote the Bankruptcy Code's "fresh start" policy. *Casini v. Graustein,* 307 B.R. 800, 817 (Bankr. D.N.J. 2004). As such, courts have limited the definition of a fiduciary for § 523(a)(4) purposes. "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith ... nor an inequality between the parties' knowledge or bargaining power ... is sufficient." *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1372 (10th Cir.1996). Thus, the scope of the term "fiduciary" in the context of section 523(a)(4) is limited to "instances involving express or technical trusts." *In re Casini,* 307 B.R. 800, 817 (Bankr. D.N.J. 2004). Here, Appellant was the fiduciary of Appellees on an express trust.

Federal case law has defined the term embezzlement to mean the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *Borchardt v. Ferrell (In re Ferrell),* Bankr. No. 04–30731, Adv. No. 04–1034., 2006 WL 1997423, at * 9 (Bankr. E.D. Pa. June 14, 2006) (quoting *Moore v. United States,* 160 U.S. 268, 269 (1895)). "To prove a debtor committed embezzlement within the meaning of § 523(a)(4), a plaintiff must establish that: (1) Appellant was entrusted; (2) with property; (3) of another; (4) which Appellant appropriated for his own use; and (5) with fraudulent intent." *Ginsburg ex rel Vertical Group, Inc. v. Birenbaum (In re Birenbaum),* Bankr.No. 05–20640, Adv. No. 05–2506, 2006 WL 1997478, at *8 (Bankr. W.D. Pa. July 7, 2006)); *see also Wolstein v. Doctoroff (In re Doctoroff),* 133 F.3d 210, 216–17 (3d Cir. 1997). "Fraudulent Intent may be 'determined from the facts and circumstances surrounding the act.' " *Harris v. Dawley, (In re Dawley),* 312 B.R. 765, 779 (Bankr. E.D. Pa. 2004) (quoting *C & J Car Rental v. Purdy (In re*

25

*Purdy),* 231 B.R. 310, 312 (Bankr.E.D.Mo.1999)). *See also*, *In re Shafer*, 07-14206 (GMB), 2010 WL 1286427 (Bankr. D.N.J. Mar. 31, 2010).

While the Bankruptcy Court appeared to rely upon § 523(a)(4) disallowance of discharge of obligations incurred as a result of the debtor's embezzlement, the facts found by the New Jersey Supreme Court support a finding against Appellant either as a disloyal fiduciary or an embezzler. In disbarring Appellant, the Supreme Court concluded that Appellant, managing attorney trust accounts containing judgment funds belonging to Appellees, knowingly and willfully transferred funds to his personal accounts without consent of Appellees, and before his entitlement to those funds had been ascertained. Stately differently, the State Court necessarily concluded that 1) Appellant was entrusted; 2) with property, namely the judgment funds held in trust; 3) of Appellees; 4) which the Appellant appropriated for his own use, namely the paying of personal debts; and 5) with fraudulent intent, because Appellant knew at the time he made that transfers out of the trust accounts that his clients disputed the fee he intended to take, and that his entitlement to the money held in trust was otherwise contested. Accordingly, this Court concludes the State Court resolved identical issues to those posed before the Bankruptcy Court.

Furthermore, although New Jersey courts apply a different standard of proof in disbarment proceedings than that applied by the Bankruptcy Court in § 523(a) actions, that fact does not undermine the identity of the issues in this case.  Here, the threshold of proof in the disbarment proceeding was even higher – and, thus, more protective of Appellant's rights – than the standard applied in the bankruptcy proceeding.  The New Jersey Supreme Court requires proof of wrongdoing by clear-and-convincing evidence in disbarment proceedings. By contrast, conclusions made by the Bankruptcy Court in adversary proceedings must be established by the mere preponderance of the evidence standard.  *See In re James*, 112 N.J. 580, 585-86, *In re*

*Hawkins*, 231 B.R. 222, 228 (D.N.J. 1999).  Therefore, while the State Court needed clear and convincing proof that Appellant misappropriated client funds, the Bankruptcy Court only had to determine that it was more likely than not that Appellant had done so.  Because the State Court determined that Appellant's actions met the higher standard of proof in the disbarment proceeding, those same actions necessarily would have met the lesser standard in the Bankruptcy Court.  As a result, the fundamental issues in the two proceedings are identical, and the first requirement for collateral estoppel is met.

B. The Issues were Actually Litigated

Next, Appellant argues that the Bankruptcy Judge improperly applied collateral estoppel to the issues decided in the disbarment proceeding because they were not actually litigated in the State Court.   With regard to the "actually litigated" requirement, New Jersey case law governing collateral estoppel requires that the party against whom the doctrine is applied had a full and fair opportunity to litigate the issue precluded.  *See Pivnick v. Beck,* 326 N.J. Super. 474, 485– 86 (App. Div. 1999).  This is satisfied when a party had the opportunity to present his evidence to a competent tribunal.  *Id.* at 491.  Appellant argues that the "actually litigated" requirement is not satisfied here based on the proposition that the disbarment proceeding "was not a trial or a litigation about the contract dispute."  [A1036].  In particular, Appellant asserts that he did not have the chance to testify or present evidence in regards to the propriety of the fee agreement, and that "normal" discovery, interrogatories or demands for documents, and depositions are not permitted in a disbarment proceeding.  [A1036-37].  Appellant's contentions fail.

In this case, the disbarment proceeding provided Appellant with the opportunity to fully litigate the issues precluded.  *See In re Logan*, 70 N.J. 222, 228 (1976) ("[D]isciplinary proceedings

afford the attorney a full opportunity to be heard . . .").  Appellant fails to recognize that the Ethics Committee and Disciplinary Review Board are agents of the New Jersey Supreme Court, and only wield advisory capabilities.  *See Gipson v. Supreme Court of New Jersey*, 416 F. Supp. 1129, 1131 (D.N.J. 1976); *In re Logan*, 70 N.J. at 225.  In fact, New Jersey Rule 1:20-16(a) provides that the "Supreme Court shall review all decisions of the Board that recommends disbarment."  While this review is conducted "on the basis of the decision, the transcript of the hearing, any briefs filed with the board, and the record of the proceedings before the Ethics Committee, if any," the Rule permits supplementation through the filing of briefs and oral argument before the Supreme Court.  New Jersey Rule 1:20-16(a).  Therefore, although the Ethics Committee and Disciplinary Review Board conduct the early stages of disbarment proceedings, the "Supreme Court then makes findings and conclusions and either discharges the order to show cause or imposes discipline."  *Gipson*, 416 F. Supp at 1131.

Appellant, in the disbarment proceeding, had the opportunity to defend his claims in a forum that provided substantial procedural and substantive safeguards — the New Jersey Supreme Court.  During Appellant's disciplinary proceedings, a special master was appointed and, after conducting an investigation that involved questioning Appellant, the special master found that Appellant misappropriated client funds.  [A1312-15].  Thereafter, the Disciplinary Review Board conducted a de novo review and adopted the special master's recommendation as supported by clear and convincing evidence. [A1387].  Throughout the entirety of the aforementioned disciplinary proceedings Appellant contested the fee dispute. [A1375].  Moreover, the New Jersey Supreme Court conducted an "independent review of the matter," in a proceeding in which Appellant entered an appearance, before concluding that Appellant knowingly misappropriated client funds.  *In re Feng Li*, 213 N.J. 523 (2013).  Accordingly, the disbarment proceeding in State

Court provided Appellant with the opportunity to fully litigate the claims against him; an opportunity he utilized.[2] Accordingly, this Court finds that the disbarment proceeding provided Appellant with the opportunity to fully litigate the issues precluded.

### C. The New Jersey Supreme Court Issued a Final Judgment

Appellant asserts that because the New Jersey Supreme Court's decision did not result in a monetary judgment for Appellees, it was not a final judgment on the fee dispute. [A1037-38]. The Third Circuit, relying on the Second Restatement of Judgments, has held that "for the purposes of issue preclusion ... 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive [effect]." *In re Docteroff,* 133 F.3d at 215–16. In determining whether the resolution was sufficiently firm, the factors to consider include whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed. *In re Brown,* 951 F.2d 564, 569 (3d Cir. 1991). However, the ability to appeal is only one factor to be considered and is not outcome determinative for the purposes of collateral estoppel. *See Id.* at 569 ("Unlike claim preclusion, the effectiveness of issue preclusion, sometimes called collateral estoppel, does not require the entry of a judgment, final in the sense of being appealable."); *In re Docteroff,* 133 F.3d at 215–

---

[2] Furthermore, had Appellant's case proceeded to the New Jersey Supreme Court from a lower New Jersey court, it is clear that the Bankruptcy Judge would have been able to apply collateral estoppel to the issue of misappropriation. *See In re Leonelli-Spina*, 426 Fed. Appx. 122, 125 (3d Cir. 2011) ("[W]e find that the Bankruptcy Curt did not err in determining that collateral estoppel applied to the Superior Court's finding of fraud and defalcation."). This Court sees no reason for not applying the same rule to the present case. Similarly, even if the disbarment proceeding was only an administrative ruling, New Jersey courts "accord administrative rulings that otherwise satisfy collateral estoppel standards preclusive effect if the proceedings provide 'significant procedural and substantive safeguards,' similar to those that are provided to litigants in courts of law." *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 87 (2012) (quoting *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 524 (2006)).

16 (rejecting argument that finality requirement was not satisfied because judgment was not appealable).[3]

Here, the State Court's determination constituted a final judgment on the issues that the Bankruptcy Judge precluded.  The State Court's finding that Appellant knowingly misappropriated client funds was the culmination of an extensive process of review.  The factual issues leading to Appellant's disbarment proceeded through the extensive discovery by a special master, were analyzed extensively in a well-reasoned opinion and recommendation by the Office of Attorney Ethics, and, eventually, were fully and independently reviewed in a proceeding before the New Jersey Supreme Court.  Along the way, Appellant had the opportunity to and in fact did contest the issues relating to the fee dispute. [A1372, 1375]. To relitigate issues identical to those found by the State Court in the disbarment proceeding would result in exactly the sort of needless duplication, expense, and undue delay that the doctrine of collateral estoppel is intended to prevent. Therefore, this Court finds that the finality requirement for collateral estoppel is met.

D. The Determination of the Fee Dispute was Essential to the Prior Judgment

The Court is not persuaded by Appellant's argument that the New Jersey Supreme Court's determination of the fee dispute was not essential to the decision to disbar Appellant.  "Under the

---

[3] Indeed, "[f]inality for purposes of issue preclusion is a more 'pliant' concept than it would be in other contexts."  *Dyndul v. Dyndul,* 620 F.2d 409, 412 (3d Cir. 1980).  Finality "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Id.* at 412 n. 8 (quoting *Lummus Co. v. Commonwealth Oil Refinery Co.,* 297 F.2d 80, 89 (2d Cir. 1961), *cert. denied,* 368 U.S. 986 (1962)).  Moreover, the Third Circuit has cautioned that "insistence on a final and fully appealed judgment can involve needless duplication and expense to decide the same issue or, alternatively, undue delay in a second action while the first action is brought to a complete finish," and that "in particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment." *In re Brown,* 951 F.2d at 569.

generally accepted meaning of the term, a fact may be deemed *essential* to a judgment where, without that fact, the judgment would lack factual support sufficient to sustain it." *Raytech Corp.*, 54 F.3d at 193. Contrary to Appellant's position, the State Court's determination that Appellant knowingly misappropriated client funds served as the basis for the decision to disbar Appellant. *See In re Feng Li*, 213 N.J. 523, 523-24 (2013). The fact that the fee dispute was essential to the State Court's judgment is illustrated by the finding that "the written fee agreement with respondent's clients did not authorize the $1.2 million fee [Appellant] took." *In re Feng Li*, 213 N.J. at 523. Without ruling on the fee dispute issue, the State Court would have lacked the factual basis to disbar Appellant. Thus, the State Court's finding that Appellant misappropriated funds was essential to its judgment.


E. Appellant was a Party to the Earlier Proceeding

  Finally, Appellant's argument that collateral estoppel does not apply because Appellees were not parties or in privity with the Office of Attorney Ethics in the disbarment proceeding is misplaced. Collateral estoppel applies "if the party *against whom* preclusion is asserted was a party, or in privity with a party, to the proceeding." *Perez v. Rent-A-Center, Inc.*, 186 N.J. 188, 199 (2006) (emphasis added); *Wildoner,* 316 N.J. Super. at 506. Here, Appellant is "the *party against whom* the doctrine is asserted," and Appellant "was a party to . . . the [prior disbarment] proceeding." *In re Hawkins*, 231 B.R. at 231 (quoting *Wildoner*, 316 N.J. Super at 506) (emphasis added). Applying those principles here, this Court finds that because the State Court determined the fee issue against Appellant in the disbarment proceeding, collateral estoppel of that issue was appropriate in the later bankruptcy proceeding.

## V. DISCRETIONARY CHALLENGE TO DENIAL OF CROSSCLAIM BY JUDICIAL ESTOPPEL

In deciding whether Appellant was collaterally estopped from relitigating the arguments raised before the New Jersey Supreme Court, the Bankruptcy Court necessarily addressed Appellant's counterclaims. In the cross-motion for partial summary judgment, Appellant made essentially the same arguments he made before the New Jersey Superior Court, before the Office of Attorney Ethics review panel, in the New Jersey Supreme Court, in the New York Supreme Court, and now again before this Court, namely that he was legally entitled to the moneys he took, and therefore the claims of his former clients and purported creditors should be disallowed. The Bankruptcy Court invoked the doctrine of judicial estoppel to find that Appellant was not permitted to once more raise these arguments, but it need not have done so, as the Bankruptcy Court's earlier invocation of collateral estoppel to adopt the findings of the New Jersey Supreme Court necessarily foreclosed Appellants' counterclaims.[4] Having already found, *supra*, that the Bankruptcy Court's application of collateral estoppel was proper, this Court now finds that the dismissal of Appellants' counterclaims was also proper.

---

[4] "Judicial estoppel is a fact-specific, equitable doctrine, applied at courts' discretion." *In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010). "More generally, and citing various circuit court decisions, including our own in *Scarano*, the Supreme Court has described judicial estoppel as imposing not "inflexible prerequisites[,]" but rather as encompassing "[a]dditional considerations [that] may inform the doctrine's application in specific factual contexts." *New Hampshire v. Maine,* 532 U.S. 742, 751 (2001) (citations omitted). The Court observed that, "[b]ecause the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion[.]" *Id.* at 749 (internal quotation marks and citations omitted). As was recently observed, "[t]he applicability *vel non* of judicial estoppel is fact-specific." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 253 n. 6 (3d Cir. 2010) (citation omitted). *Id.* at 638-39. Given the very generous standard of review, it is doubtful that even if the Bankruptcy Court had needed to rely upon the doctrine of judicial estoppel, that this Court would find its exercise to have been an abuse of discretion.

## VI. LEGAL CHALLENGE TO THE OF STATEMENT OF UNDISPUTED FACTS

Appellant also argues that the Bankruptcy Court's reliance upon the Statement of Undisputed Facts submitted by Appellees was in error 1) because "the facts are to a large extent hotly disputed," and 2) because Appellees' submission was not submitted under oath or as part of a formal certification. Considering Appellant's first argument, it does not appear that the Bankruptcy Court in fact relied upon Appellees' Statement of Undisputed Facts to any significant extent, because that court's own observations of Appellant's conduct in the handling of his bankruptcy petition formed the basis of the nondischargeability determination under § 727(a)(4), and because the findings of the New Jersey Supreme Court, which Appellant was collaterally estopped from contesting, formed the basis of the nondischargeability determination under § 523(a)(4). Moreover, Appellant does not indicate any specific instances in which an allegedly disputed fact was relied upon to Appellant's detriment. In fact, in this Court's review, the Bankruptcy Court resolved several issues of disputed fact in Appellant's favor at the December 2013 hearing. For example, Appellees vigorously contest that Appellant's transfer of the judgment funds to China was for the purpose of paying a legitimate debt. Instead, they argue that the Appellant arranged sham transfers and retains control of the money spirited overseas. Appellees introduced Appellant's inconsistent statements at his deposition and the timing of Appellant's travels to China in support of their contention. Nevertheless, Judge Kaplan found as "undisputed that all of these funds were transferred out from these children's accounts to outside of this country in order to satisfy certain personal obligations of the debtor to pay creditors arising from Shanghai Internet Services company." [A1623-24].

Considering Appellants second argument, it appears that Appellant is correct that the Statement of Undisputed Facts itself appears to be an unsworn submission of counsel, but fails to appreciate that Appellees support each of the stated undisputed facts with citations to the exhibits attached to the Declaration of Willard C. Shih, submitted at the same time, [A1218], and that Mr. Shih's Declaration is clearly sworn as "true and correct" "under penalty of perjury." [A1236]. Appellant's contention that Appellees did not submit undisputed facts under oath is simply mistaken.

CONCLUSION

For the foregoing reasons, this Court finds that i) the Bankruptcy Court's findings that Appellant made misrepresentations in connection with his bankruptcy petition are not clearly erroneous, ii) Appellant was collaterally estopped from challenging the findings of the New Jersey Supreme Court, and iii) the Bankruptcy Judge properly dismissed Appellants counterclaims. Accordingly, the decision of the Bankruptcy Court is affirmed in its entirety.

Order to follow.

Dated:   ____8/22/2014_____                                    _____/s/ Freda L. Wolfson_____
                                                             The Honorable Freda L. Wolfson